# Richmond

## C. J. Spinks v. Ashby L. Rice, Jr.

April 26, 1948.

Record No. 3324.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Staples
and Miller, JJ.

The opinion states the case.

*George A. Revercomb, Jr.,* and *R. B. Stephenson,* for the appellant.

*T. Moore Butler* and *J. C. Goodwin,* for the appellee.

MILLER, J., delivered the opinion of the court.

Mary Jane Steele died on January 3, 1946, leaving a personal estate of considerable value and a small house and lot located in Covington, Alleghany County, Virginia. She was a widow and left no children or direct descendants, her closest relatives being nieces and nephews.

On February 1, 1946, a paper writing, dated July 14, 1939, was admitted to probate in the clerk's office of the Circuit Court of Alleghany County as the holographic will of Mary J. Steele. One Raynor E. Agner qualified as administrator, c. t. a. on decedent's estate.

The will is as follows:

"July 14, 1939.

"This is just a few things I want done at my death.

"I want Jennie dedrick to have my mothers gold breast pin also my gold neckless and my red letter testament. I want also Helen Agner to have my diamond ring. Edith Agner to have the plain gold ring Mr. Lair give me and the one left on my finger Mr. Steele give me and I want Elsie Agner to have my machine and John Thomas girl Elsie to have my trunk of clothes. I want Curtis Thomas to have my fountain pen also my little watch and you will find some money in my trunk which I want Will Thomas to have. I want one 100 dollars of my money in the bank to be given to Covington Baptist Church then after all my just Debts have been paid then I want all the rest of my estate to go to my step grand sun Ashby L. Rice Jr you will find a letter in my trunk addressed to Ashby L. Rice, Jr. which you will please give him. Will you all please do just what I have asked you all to do.

"Mary J. Steele."

The will disposes of testator's entire estate. Several minor bequests are made to named legatees and the residue now valued at between $7,500 and $10,000 is left to Ashby L. Rice, Jr.

On December 12, 1945, Mary Jane Steele and C. J. Spinks executed the following written agreement:

"This Agreement made this 12th day of December, 1945, between C. J. Spinks and Mary Jane Steele,

"WITNESSETH: that whereas the said parties hereto being

desirous of making arrangements concerning the future, it is hereby agreed, as follows,

"In the event the said C. J. Spinks should die before the said Mary Jane Steele, any and all property he may have is to be her sole and separate property.

"It is also agreed that in the event the said Mary Jane Steele die first, then she desires and hereby directs that the said C. J. Spinks shall have the same without any claim of any other person.

"This the 12th day of December, 1945.

"C. J. Spinks,
"Mary Jane Steele.

"Teste

"F. M. Arbuckle,
"N. P.

"(Notarial Seal)."

In January 1947, about eleven months after probate of the will, C. J. Spinks instituted this chancery suit against Raymond E. Agner, administrator c. t. a., Ashby L. Rice, Jr., and the other legatees. In the bill of complaint he asserts that under the above paper writing he is entitled to all of the estate owned by Mary Jane Steele at the time of her death, subject only to the payment of her debts, funeral expenses and costs of administration.

We quote the principal allegation of the bill asserting the claim and alleged rights of the complainant:

"Your complainant further represents the he knew the said Mary J. Steele; that he kept company with her for about two years prior to her death, and that he and the said Mary J. Steele had great affection for each other, and they had planned to be married in March, 1946; that complainant and the said Mary J. Steele on December 12, 1945, made and entered into a written agreement which was signed by them, whereby it is provided that if your complainant should die before the said Mary J. Steele that then the said Mary J. Steele should have all the property of your complainant, and that if the said Mary J. Steele should die

before your complainant that then your complainant was to have all the property of the said Mary J. Steele."

By proper recital the agreement is made a part of the bill. It then alleges that as he survived Mary J. Steele, the "paper writing purporting to be her will" which was admitted to probate and which left the bulk of her estate to Ashby L. Rice, Jr., is "superseded and rendered inoperative and ineffective by said written agreement"; that the "will should be set aside" and complainant be held entitled to decedent's property and estate.

He prays that the written agreement be "established, construed and given full force and effect", and that he be decreed the estate, real and personal, owned by the decedent at the time of her death.

The complainant asserts his claim to the estate of Mary J. Steele solely by virtue of the alleged agreement of December 12, 1945.

Ashby L. Rice, Jr., principal beneficiary under the will, was the only defendant who made appearance to the bill. He filed a demurrer thereto, the substance of its grounds being that the writing on which complainant relies has no legal force and effect. He earnestly contends that it is wholly insufficient and ineffectual to sustain the claim.

The judge of the trial court concluded that the written instrument was not a deed or a valid will, nor was it an enforceable contract; he sustained the demurrer and dismissed the bill of complaint. From that decree, this appeal was awarded.

In the brief of appellee and in oral argument at bar, it is contended that the bill is lacking in necessary averments to establish a trust or to secure specific performance—in short, that the bill is insufficient even if the fundamental right to the relief sought actually exists. A somewhat similar objection was made by appellant to appellee's grounds of demurrer.

We, however, think the bill is sufficient in its allegations to secure to appellant the rights, if any, to which he is entitled under the terms of the instrument relied upon.

We likewise conclude that the demurrer, upon the grounds assigned, fairly presents the question whether appellant is, in any event, entitled, under the instrument or alleged agreement, to the estate of Mary J. Steele, left by her at the time of her death.

Three specific grounds of demurrer are assigned. By the first it is claimed that whatever legal or contractual validity and force, if any, the instrument may have, it does not include and was not intended to affect any property owned by decedent. It is contended that the paragraph which reads: "It is also agreed that in the event the said Mary Jane Steele dies first then she desires and hereby directs that the said C. J. Spinks *shall have the same* without any claim of any other person", refers to the property of C. J. Spinks and not to hers. (Italics supplied). It is insisted that "shall have the same" means the property mentioned in the preceding paragraph of the writing, which was the property of appellant, and nowhere in the instrument is there reference made to any property owned by Mary J. Steele.

In construing the phrase "shall have the same", the entire writing should be considered and the meaning so ascertained, if possible, from the full context. If the language is still susceptible of more than one meaning, resort may then be had to parol proof to explain the ambiguity. *Protestant Episcopal High School* v. *Parrish*, 168 Va. 103, 190 S. E. 146. Therefore, if the rather uncertain meaning or alleged ambiguity in that phrase was the only question presented, we would overrule the demurrer.

The other grounds of demurrer strike deeper. They go to the fundamental validity of the entire instrument. They require careful consideration of its inherent character and a determination of whether any legal rights are thereby conferred upon appellant.

It is conceded in appellant's reply brief that it is not a deed or will. The writing obviously contains none of the attributes of a deed. It fails to measure up to a will, however, solely because of insufficiencies in its formal execution.

It is ambulatory, dispository, and testamentary in character. Fundamentally and intrinsically it bears and has all the necessary qualities of a will and falls short of full recognition as such, not because of inherent insufficiency, but only due to lack of formal execution.

The instrument contains no promise to execute a deed or will and is not intended as a contract to make a deed or will. They call it an agreement, but its name does not necessarily make it such. It is simply what it appears to be, i. e., an ambulatory, dispository, reciprocal testamentary undertaking between two people to pass, upon the death of the maker first to die, his or her property to the survivor. It has been finally executed by the parties signatory and is, in and of itself, supposed to pass property only upon death. It contemplates no further action and is obviously the first and last instrument intended to be executed by the makers to carry into effect their wishes by testamentary operation, the purpose and will of the makers being that the property of the one first to die pass at his or her death as he or she directs by and under that instrument, and that it, by its terms, necessarily ceases to operate as to the estate of the survivor.

■ Being a will in substance, but lacking in the necessary formalities of execution, no property can pass thereunder as a will. In attempting to have it function, appellant contends that it is a contract between the parties that each shall have the other's property upon the death of the one who is first to die.

If it had been formally and properly executed, it would have been the will of each, to be probated upon the death of each, and any property that passed thereunder would have passed by virtue of the testamentary character of the instrument.

■ It is really and in fact a joint, mutual and reciprocal will, but in the final analysis lacks the formalities of execution to be a valid will. Such wills, though embodying contractual obligations, are now universally recognized and

admitted to probate if executed with the necessary formalities.*

Upon the authority of many decisions and the Virginia cases of *Williams* v. *Williams*, 123 Va. 643, 96 S. E. 749; *Wingold* v. *Bagley*, 164 Va. 431, 180 S. E. 151; *Harlan* v. *Weatherly*, 183 Va. 49, 31 S. E. (2d) 263, appellant earnestly insists that in equity he is entitled to have the property owned by decedent at the time of her death decreed to belong to him. Though the instrument speaks only at the time of death of one of its makers, appellant contends that it rests upon a valuable consideration, a promise for a promise, and has such contractual force and validity to secure to him equitable right of ownership in the property claimed.

The instrument under which appellant here asserts his claim is easily distinguishable from those involved in the cases mentioned next above. In *Williams* v. *Williams, supra,* the writing constituted a joint and mutual will which had been actually executed by both makers as required by statute. In addition it contained mutual obligations on the part of the makers thereof. After death of one of the makers, and receipt of benefits under the will by the other, the surviving maker undertook to revoke and did

---

*Doyle* v. *Fischer*, 183 Wis. 599, 198 N. W. 763, 33 A. L. R. 733; *Frazier* v. *Patterson*, 243 Ill. 80, 90 N. E. 216, 27 L. R. A. (N. S.) 508 and notes; *Carle* v. *Miles*, 89 Kan. 540, 132 P. 146; *In re Diez's Will*, 50 N Y. 88; *Stevens* v. *Myers*, 91 Or. 114, 177 P. 37, 2 A. L. R. 1155; *Deseumeur* v. *Rondel*, 76 N. J. Eq. 394, 402, 74 A. 703; *Ireland* v. *Jacobs*, 114 Colo. 168, 163 P. (2d) 203, 161 A. L. R. 1413; *Menke* v. *Duwe*, 117 Kan. 207, 230 P. 1065; *Rastetter* v. *Hoenninger*, 214 N. Y. 66, 108 N. E. 210; *Manrow* v. *Deveney*, 109 Ind. App. 264, 33 N. E. (2d) 371; *Mack* v. *Swanson*, 140 Neb. 295, 299 N. W. 543; *Edson* v. *Parsons*, 155 N. Y. 555, 50 N. E. 265; *Brown* v. *Johanson*, 69 Colo. 400, 194 P. 943; *In re Davis' Will*, 120 N. C. 9, 26 S. E. 636; *Ginn* v. *Edmundson*, 173 N. C. 85, 91 S. E. 696; *In re Cawley's Estate*, 136 Pa. 628, 20 A. 567, 10 L. R. A. 93 and notes; *Nye* v. *Bradford*, 144 Tex. 618, 193 S. W. (2d) 165, 169 A. L. R. 1, notes 9 to 29; Page on Wills, Vol. 1, 2d Ed., Sec. 104, p. 221; Thompson on Wills, 2d Ed., Sec. 34, p. 55; Schouler on Wills, Vol. 1, 6th Ed., Sec. 455, p. 573; 32 Harvard Law Rev. 296; 17 Mich. Law Rev. 677; 28 Harvard Law Rev. 237 at p. 246; 13 Calif. Law Rev. 179; 35 Yale Law Journal 644; 15 Tenn. Law Rev. 727; 19 Minn. Law Rev. 95; 18 Rocky Mountain Law Rev. 366, and 24 Marquette Law Rev. 42.

revoke the instrument as his will. Upon resort to equity by the parties who were to receive estate from the co-testator who undertook to and did revoke his part of the will, it was concluded that the contractual and mutual obligations between the co-testators which became fully executed on the part of the one first to die, by the other receiving and obtaining the benefits thereof, effectively bound him to his contractual obligations and a trust was established on behalf of the beneficiaries thereunder. In quoting from *Frazier* v. *Patterson*, 243 Ill. 80, 90 N. E. 216, 27 L. R. A. 508, this statement is made at page 655 of 123 Va.:

" 'That such wills constituted a mutual contract between the parties which could not be rescinded by the survivor after the death of one on the theory that the first that dies carries his part of the contract into execution.' " Of similar import is *Deseumeur* v. *Rondel*, 76 N. J. Eq. 394, 402, 74 A. 703.

In *Wingold* v. *Bagley, supra,* a valid and executed contract to make a will in favor of complainant was proved. His claim rested upon a consideration fully furnished and performed. The property contracted to be devised by the contemplated will was impressed with a trust in favor of complainant. It was simply a contract to make a will, certain and specific as to the property involved and for a valuable consideration duly rendered. The character and nature of the claim there involved and sustained was materially different from that here presented. Similar upon principle to that case is *Burdine* v. *Burdine*, 98 Va. 515, 36 S. E. 992, 81 Am. St. Rep. 741.

In *Harlan* v. *Weatherly, supra,* the instrument under which claim was made to the estate was definitely contractual in nature and so intended,—in fact, it well-nigh measured up to the requisites of a complete and formal deed, failing as such only because it lacked an effectual and full granting clause. It was intended to and did effect an equitable transfer, during the life of the makers, of a remainder in the estate involved, with the makers retaining

their respective life estates. It had been fully executed, signed by both parties, sealed by one, acknowledged, delivered and admitted to record as a deed. Rights and interests were intended to attach and did fully attach upon execution and delivery of the instrument and during the lifetime of the parties thereto. There it is said:

"The parties to the writing of August 8, 1927, thought the writing was a deed. They called it a deed, and none of these protesting children ever questioned its character or validity until after the mother's death.

"* * * Many valid contracts have a testamentary flavor. To convey estates and at the same time to retain a life interest is common practice. (Citing cases).

"* * * Here the conveyance is of all 'estate and personal and everything in fee simple forever.'"

In that case the instrument executed between husband and wife conveyed *in praesenti* mutual interests in both real and personal estate. It was founded upon mutual valuable considerations and had not only been treated by the parties as a binding contract, but actually as fulfilling all of the requirements of a formal deed, which, in equity, it really was. To the same effect is *Foster* v. *Helms*, 169 Va. 634, 194 S. E. 799.

Pure testamentary disposition of property must be by will and cannot be made by contract. The inherent and intrinsic characteristics of the two undertakings are repugnant. But difficulty often arises in distinguishing a will from a contract. The fundamental difference is well expressed by the following authorities:

"The essential characteristic of a will is, that it operates only upon and by reason of the death of the maker. Up to that time it is ambulatory and revocable. By its execution the author has parted with no rights nor divested himself of no interest in or control over his property, and no rights have accrued to, and no estate has vested in, any other person. The death of the maker for the first time establishes the character of the instrument. It then ceases to be ambulatory, acquires a fixed status,

and operates as a transfer of title. An instrument which is to operate in the lifetime of the donor, and to pass an interest in his property before his death, even though its absolute enjoyment by the donee is postponed till the death of the donor, or even if it is contingent upon the survivorship of the donee, is a deed, contract, or gift, and not a will. It is essential to a will that it should be made to depend upon the death of the maker to consummate it, up to which time it is inoperative and revocable." (Citing cases.) 89 Am. St. Rep. 487.

■ "The rule of construction in determining whether an instrument is a will or contract is, that if it passes a present interest, it is a deed or contract; but if it does not pass an interest or right until the death of the maker, it is a testamentary paper." 89 Am. St. Rep. 488.

"In determining the question whether an instrument is a will or a contract, the time when the property rights under the instrument attach is the true test and not the time of performance. * * * Where the instrument contains no words that create the relation of debtor and creditor in the lifetime of the parties thereto, but the words employed simply import a posthumous disposition of a part of the estate of the maker of the instrument, it is testamentary in character and will be given effect as a will if executed with the formalities required by the statute." Thompson on Wills, Second Edition, Sec. 14, p. 23.

"In general the test of testamentary character is the same as in the situations discussed heretofore, viz., does the paper show an intention to presently create an interest in another though enjoyment is postponed, or does it create no such interest but merely direct what shall be done after the maker's death, being entirely ambulatory until that time? This is frequently a fine and difficult distinction to draw, but it is often vital to the success of the instrument. Thus, if the court decides that the document is testamentary, it can be valid only as a will and if it lacks the required formalities of the latter, it will be of no effect. On the other hand, if the instrument is nontestamentary

in character, its execution with testamentary formalities will not sustain it, but it is invalid for all purposes unless it has all the requirements necessary for some sort of *inter vivos* transaction." Atkinson on Wills, Sec. 64, p. 151.

Among Virginia cases applying the above principle are *McBride* v. *McBride*, 26 Gratt. (67 Va.) 476, and *Mumpower* v. *Castle*, 128 Va. 1, 104 S. E. 706.

There are but two conduits or cables, the statute of wills, and of descents and distributions by which the Grim Reaper may at the moment of and by the stroke of his scythe flash the transfer and transmission of property and estate to the quick from the dead. A gift *causa mortis* is the next nearest approach to this accomplishment. But even there death does not spark the transmission. It is but the final seal upon an existing intent to donate coupled with a previously executed act of delivery. There death precludes revocation of a thing already done.

Those two statutes are, for the purpose intended, all inclusive, self-sufficient and stable. Equity may not be used to stretch and extend them. But here, by the application of equitable principles, an attempt is made to effectually bypass the statute of wills. A somewhat similar but futile effort to circumvent the statute of descents and distributions was made in *Clarkson* v. *Bliley*, 185 Va. 82, 38 S. E. (2d) 22. There one Annie Amelia Clarkson died intestate. Irving F. Clarkson, a foster son, made claim to the estate by inheritance. He had never been legally adopted. His claim was predicated upon an alleged agreement on the part of decedent made in her lifetime to adopt him. The actual adoption had, however, never been consummated by decree of court. In the able and convincing opinion of Judge Brockenbrough Lamb of the Chancery Court of Richmond, which was adopted *in toto* by this court, it is said:

" 'It is the judgment of the court that the statute of descents and distributions may not thus be altered by private contract, whether written or oral; that rights of inheritance cannot be left uncertain and dependent upon

evidence of private, and perhaps secret, agreements. As I see it sound public policy imperatively demands that no such doctrine be sanctioned. It would be violative of the deepest instincts of our people and contrary to our fundamental institutions.

' 'Around the devolution of estates of decedents the law has thrown its most jealous safeguards; witness the stringent and strictly enforced requirements with respect to the mode in which wills must be executed, and the fixed and rigid provisions of the statute of descents and distributions, to which allusion has been made. No device whereby these safeguards may be weakened should be recognized or for a moment tolerated. At the very first attempt to assert a right of succession to any part of a decedent's estate by any person claiming in any capacity other than that of a beneficiary under a lawful will, or heir or next of kin if there be no such will,—this firm assertion of denial should be made; not only to dispose of the claim then before the court but to discourage the assertion of such claims by others, whether in good faith, as is obviously true in the case at bar, or fictitious, as the circumstances of death and secrecy might well invite if the door should be left ajar.

"* * * 'Some things are beyond the aid of equity; and in my judgment, properly so. For instance, equity cannot complete an incomplete gift, no matter how clear the donor's intent or how meritorious the donee's claim. And no one would claim that equity could reform or aid an improperly executed will, no matter how clearly and emphatically the testamentary intent might be expressed; it is ineffectual unless it be expressed in form and manner as required by the statute.' "

The principle there announced and the danger voiced apply here with equal urgency and compelling force.

■ *Wills*, as such, simply cannot be made solely by mutual agreement. If the instrument is fundamentally testamentary, it must comply with the statutory formalities. *Towle* v. *Wood*, 60 N. H. 434, 49 Am. Rep. 326.

If the validity of this instrument be established, it would

accomplish a clear evasion of the statute of wills. And of equally serious results, it would, not until, but at the death of one maker effectually nullify or revoke a previously made will. That result would inevitably follow though this instrument is not executed as required by section 5233 of the Code, which is as follows:

"No will or codicil, or any part thereof, shall be revoked, unless under the preceding section, or by a subsequent will or codicil, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is required to be executed, or by the testator, or some person in his presence and by his direction, cutting, tearing, burning, obliterating, canceling, or destroying the same, or the signature thereto, with the intent to revoke."

The instrument here sued upon was and is actually a joint and mutual will, in substance, dressed in the clothes of a contract—an old will with a "new look". But by the aid of equity, upon and at the death of one of the parties signatory, effort is made to transform it into a contract, in substance, enforceable by the surviving co-maker. And it is sought to have it so operate as to effectually nullify or revoke a previous will of the party who died, and lapse, nullify itself and cease to function as a valid instrument of any character as to the estate or property of the survivor. Upon the death of one, it is to spring into life and operate upon the estate of the dead, but it is to die and be inoperative as to any estate of the survivor.

We find no such hybrid instrument, with its dual personality, self-executing and shifting gears, chameleon charactertistics and Phoenix-like qualities as yet known to the law.

Due to its conflicting features, inherent infirmity, and external insufficiency, it died aborning.

The decree appealed from is therefore affirmed.

*Affirmed.*